IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT MIDDLETON, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 06-594 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
|       Defendant. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, Robert Middleton, seeks judicial review of a
decision of defendant, Commissioner of Social Security ("the
Commissioner"), denying his application for disability insurance
benefits ("DIB") under Title II of the Social Security Act, 42
U.S.C. §§ 401-433.  Presently before the Court are the parties'
cross-motions for summary judgment pursuant to Rule 56 of the
Federal Rules of Civil Procedure.  For the reasons set forth
below, (a) plaintiff's motion for summary judgment will be
granted in part; (b) the Commissioner's motion for summary
judgment will be denied; and (c) the case will be remanded to the
Commissioner for further proceedings consistent with this
Memorandum Opinion.

## II. Background

### A. Procedural History

Plaintiff filed an application for DIB on June 12, 2001, alleging disability since May 24, 1995 due to conversion disorder.[1]  (R. 63, 79-88).  Subsequently, plaintiff amended his application to change the alleged onset date of disability from May 24, 1995 to May 15, 2001.[2]  (R. 66).  Plaintiff's application was denied initially and upon reconsideration (R. 46-49, 52-53), and plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (R. 57).

---

[1] In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1).  A claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

[2] With respect to the alleged onset date of plaintiff's disability, he provided conflicting information in the Disability Report completed on the date he filed his application for DIB. Specifically, in the report, plaintiff indicated that he became unable to work because of his medical condition on May 24, 1995. Plaintiff then indicated that he actually stopped working on May 11, 2001, and plaintiff listed the various jobs he held between those dates.  In addition, plaintiff did not indicate that he stopped working on May 11, 2001 due to his alleged disabling condition.  Rather, plaintiff indicated that he stopped working on that date because his "position was not available anymore." (R. 80).

2

A hearing was held before ALJ Steven Slahta on December 9, 2003. Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified at the hearing. (R. 966-96). On March 23, 2004, the ALJ issued a decision denying plaintiff's application for DIB. Specifically, the ALJ concluded that although plaintiff suffers from severe mental impairments, including a personality disorder, major depression and an anxiety disorder, he retained the residual functional capacity ("RFC") to perform a significant range of very heavy work.[3] (R. 19-32).

Plaintiff requested review of the ALJ's decision; however, the request was denied by the Appeals Council on March 10, 2006. (R. 9-11, 14). This appeal followed.

## B. Plaintiff's Hearing Testimony

Plaintiff's testimony at the hearing before the ALJ on December 9, 2003 may be summarized as follows:

Plaintiff, who was 30 years old at the time of the hearing,[4] is single and resides with his parents. (R. 970). With respect to education, plaintiff is a high school graduate. (R. 968). After high school, plaintiff enlisted in the United

---

[3]RFC is defined in the Social Security Regulations as the most a claimant can still do despite his or her limitations. See 20 C.F.R. § 404.1545.

[4]Plaintiff's date of birth is August 8, 1973. (R. 63).

States Marine Corps. He was honorably discharged in 1995.[5] (R. 969-70). During his military service, plaintiff was hospitalized on numerous occasions for both physical and psychiatric reasons.[6] (R. 985).

With respect to past employment, plaintiff has worked as a floor supervisor for a telemarketing firm,[7] a corrections officer in a prison, and a stocker for a retail electronics store.[8] (R. 969, 974). Plaintiff maintains that he is no longer able to work due to anxiety, fatigue related to sleeping difficulties, headaches, irritability, "the stresses of work," problems dealing with people due to "a lot of distrust" and nervousness.[9] When

---

[5]Plaintiff actively served in the United States military from July 27, 1992 to December 31, 1995. (R. 63).

[6]Plaintiff testified that he suffered seizures while he was in the military, which were diagnosed as "pseudo seizures." With respect to his understanding of the diagnosis, plaintiff testified: "A doctor told me that a pseudo seizure is when the mind lets the body know that it cannot take anymore, and it goes into a remission state, or it just breaks down." Since his discharge from the military, plaintiff's seizures have ceased. (R. 980).

[7]Plaintiff testified that he supervised 25 to 27 employees in this position. (R. 969).

[8]During his military service, plaintiff worked in the supply department where he ordered, received and distributed telephone equipment. (R. 81).

[9]With regard to sleeping difficulties, plaintiff testified that he did not sleep the night before the hearing, and that he had been awake since 10:00 a.m. the previous day. Despite this problem, sleeping pills have never been prescribed for plaintiff, Rather, he has been instructed to try to relax more before he goes to sleep and take hot baths, "things of that nature." (R.

4

plaintiff gets very irritated, he "snap[s]," saying "a lot of nasty things" and "cuss[ing] a lot," which is "not good in a work environment."   (R. 973-74).

Plaintiff attempted to obtain a certificate from the Pittsburgh Beauty Academy through an educational assistance program sponsored by the Veterans Administration ("VA"). However, plaintiff was unable to complete the program due to nervousness from "being around people," an attendance problem as a result of sleepless nights, headaches, anxiety and an attitude problem as a result of his inability "to get them to understand ... how I was feeling, whether I was nervous, or upset."   (R. 975, 990).

Plaintiff's medical coverage is provided by the VA.   (R. 972).   Between January 2003 and the time of the hearing in December 2003, plaintiff had been treated at a VA facility only 2 or 3 times which he attributed to the birth of his son in April and the problems experienced by his fiancee in connection with the pregnancy and birth, difficulties encountered in scheduling medical appointments and inclement weather.   (R. 979, 986).

In the month preceding the hearing, plaintiff started taking Prozac for depression and anxiety.[10]   He also takes Prevacid for

975-76).

[10]Prior to the Prozac, Effexor had been prescribed for plaintiff's depression and anxiety.  Plaintiff testified that he took Effexor for about a year and a half, but that the medication

gastroesophageal reflux disease ("GERD"). (R. 972, 978, 983).

Plaintiff suffers from migraine headaches "at least five times" a

week during which he experiences very sharp pain and sensitivity

to light and noise.  Plaintiff takes Ibuprofen for the migraine

headaches.  (R. 981, 989).  Plaintiff also suffers from back

spasms when he is under a lot of stress.  (R. 983).

    In the six years preceding the hearing, the only diagnosis

which has been made concerning plaintiff's condition is

conversion disorder.[11]  (R. 980).  Regarding treatment other than

_____

made him nauseous, resulting in the change to Prozac.  (R. 972).

[11]The diagnostic criteria for conversion disorder, which is
attached to the brief filed by plaintiff in support of his motion
for summary judgment, is described as follows:

**Diagnostic criteria for 300.11 Conversion Disorder**

A.  One or more symptoms or deficits affecting voluntary
    motor or sensory function that suggest a neurological
    or other general medical condition.
B.  Psychological factors are judged to be associated with
    the symptom or deficit because the initiation or
    exacerbation of the symptom or deficit is preceded by
    conflicts or other stressors.
C.  The symptom or deficit is not intentionally produced or
    feigned (as in Factitious Disorder or Malingering).
D.  The symptom or deficit cannot, after appropriate
    investigation, be fully explained by a general medical
    condition, or by the direct effects of a substance, or
    as a culturally sanctioned behavior or experience.
E.  The symptom or deficit causes clinically significant
    distress or impairment in social, occupational, or
    other important areas of functioning or warrants
    medical evaluation.
F.  The symptom or deficit is not limited to pain or sexual
    dysfunction, does not occur exclusively during the
    course of Somatization Disorder, and is not better

6

medication, one-on-one counseling and anger management classes have been recommended to plaintiff.[12]  (R. 983).

With respect to activities of daily living, plaintiff has a driver's license, and he drives 75 to 100 miles in a typical week.  (R. 971).  During the day, plaintiff cares for his son with the assistance of his parents because his fiancee attends school.  (R. 988).  Plaintiff naps twice a day due to his sleeping difficulties.  (R. 976-77).  Plaintiff's ability to concentrate is "very effected" by his mental impairments.[13]  (R. 978).  As a result, he does not read because "the focus isn't there."  (R. 991).  Plaintiff plays drums in a musical ensemble on Sunday mornings at his church.  The group rehearses once during the week.[14]  (R. 971).  Regarding his activities on the day preceding the hearing, plaintiff got up around 10:00 a.m.,

_____

accounted for by another mental disorder.

(Doc. No. 16, Exh. C).

[12]As to scheduling either of these recommendations, plaintiff testified that he was waiting for a referral from the VA, which is "a tedious process."  (R. 984).

[13]With respect to his concentration difficulties, plaintiff testified that he can get lost while driving in his own neighborhood, requiring him to pull over to try to relax and get himself "together."  (R. 978).

[14]In connection with his ability to engage in this group activity, plaintiff testified that he is "comfortable" because his mother plays the piano next to him while he is playing the drums.  (R. 990).

7

.    .

drove to the Post Office to get his mail, watched television,
helped his father put up the Christmas tree and went to Wal-Mart
for his mother.  (R. 991).  Plaintiff does not cook and he does
not socialize with family members who reside nearby.  (R. 991).

## C. Vocational Expert Testimony

John Panza was called to testify as a vocational expert at
the hearing on December 9, 2003.  The ALJ asked Mr. Panza to
assume a hypothetical individual of plaintiff's age (younger
individual) and education (high school) who is capable of
performing light work with the following limitations:[15] (1) the
individual is limited to unskilled, low stress, entry level work
involving one or two-step processes or routine, repetitive tasks;
and (2) the individual is limited to working primarily with
things rather than people.  The ALJ then asked Mr. Panza whether
there were any jobs existing in significant numbers in the
national economy which the hypothetical individual could perform.
Mr. Panza responded affirmatively, identifying the jobs of small
parts assembler and light housekeeper.  (R. 993-94).

The ALJ then asked Mr. Panza if the hypothetical individual
could perform the cited jobs if a conversion disorder impacted
the individual's ability to stay on task 1/3 to 2/3 of the day,

---

[15]The reason for the ALJ's limitation of the hypothetical
individual to light work is unclear in light of his ultimate
determination that plaintiff retained the RFC for very heavy work
due to the absence of any physical impairment.

8

and Mr. Panza testified that he could not. (R. 994). Counsel
then asked Mr. Panza how many outbursts by an employee, i.e.,
cursing at supervisors and co-workers, would be tolerated by an
employer, and Mr. Panza testified that "it would be dependent
upon the severity [of the outbursts] and how long they lasted."
If the hypothetical individual had two outbursts a month
requiring him to leave work, Mr. Panza testified that the
individual's absenteeism would not be tolerated by any employer.
(R. 995).

## D. Evidence in the Record

The administrative record in this case contains the
following evidence:

### 1. Letter regarding Plaintiff's Physical Evaluation Board - 6/29/95

On June 29, 1995, the Commanding Officer of the Naval
Hospital at Camp Lejeune in North Carolina prepared a letter
regarding the Physical Evaluation Board which had been convened
for plaintiff. In the letter, plaintiff's initial diagnoses were
described as conversion disorder, histrionic traits and possible
generalized seizures, and the following limitations of duty were
recommended: "No driving military vehicles, firing range,
handling of weapons or ammunition. No field duty or
deployments." (R. 755).

**2.  Addendum to Plaintiff's Physical Evaluation Board -**

**9/8/95**

An addendum to plaintiff's June 29, 1995 Physical Evaluation

Board was prepared on September 8, 1995, setting forth, in

detail, the history of plaintiff's medical condition as

follows:[16]

> The patient is a 22-year-old right-handed black male
> with a complex history who initially came to medical
> attention in April of 1995 when he presented to the
> emergency room at Naval Hospital, Camp Lejeune, with an
> episode presumed to be a seizure.
>
> At the time of his initial presentation, the patient
> complained of a one-week history of intermittent periods of
> left lower extremity paresthesias generally lasting ten to
> twenty minutes at a time occurring one to two times per day.
> The patient was brought to the emergency room because he
> experienced an episode of left lower extremity motor
> activity followed by loss of consciousness while driving a
> vehicle on Onslow beach at Camp Lejeune.  This vehicle was
> only traveling a few miles per hour and the other occupant
> of the vehicle was able to hit the brakes.  While in the
> emergency room, the patient was observed to have another
> episode described as consisting of several minutes of left
> lower extremity clonic-like jerking followed by generalized
> clonic jerking with loss of consciousness followed by a
> brief "postictal" period of confusion.  At that time, the
> patient was loaded with Dilantin, 1 gram, and admitted to
> the Internal Medicine Service for further evaluation.  The
> patient received a lumbar puncture at that time to rule out
> an infectious cause of these symptoms which was completely
> normal.  The patient subsequently underwent an MRI of the
> brain which revealed three to four tiny punctate lesions
> characterized by increased signal on T2 weighted images in
> the subcortical white matter.  These were very nonspecific

---

[16]Although the Court's quotation from the addendum to
plaintiff's June 29, 1995 Physical Evaluation Board is lengthy,
it is necessary for a full understanding of the history of
plaintiff's alleged disability.

10

in nature and could be consistent with congenital lesions
(old infection, trauma), less likely demyelinating process
or vasculitis. Based on these findings, the patient
received a second lumbar puncture in order to look for a
pleocytosis that might suggest vasculitis. This lumbar
puncture was also negative. A CSF electrophoresis,
oligoclonal bands, and myelin basic protein were normal.
The patient underwent a routine and sleep deprived EEG which
failed to delineate any epileptiform activity and were
normal. The patient was subsequently discharged from the
hospital on a standard dose of Dilantin.

Over the ensuing weeks to months, the patient
repetitively was brought to his branch medical clinic and/or
the emergency room at Naval Hospital, Camp Lejeune,
exhibiting various functional neurological symptoms, the
most prominent of which was pseudoseizures. Multiple of
these episodes were witnessed and consisted of various limbs
exhibiting flailing motor activity associated with retention
of consciousness. He was often observed to state
emphatically during this motor activity, "I am having a
seizure." On one occasion, the patient was brought to the
emergency room complaining of generalized weakness
(particularly in the lower extremities) and inability to
walk. Neurological exam demonstrated completely normal
strength and a functional gait. When told to run, the
patient ran across the emergency room normally but when
asked to walk, he again demonstrated a functional ataxic
type of gait. Subsequently, the patient became extremely
irritable and frantic, began to cry uncontrollably, and
while prone on the gurney in the emergency room began
exhibiting clonic-like movements of all four extremities in
a somewhat asynchronous fashion. During these movements,
the patient lacerated his gum on the metal part of the
gurney leading to fairly profuse bleeding. Upon cessation
of this motor activity which lasted approximately 90
seconds, the patient exhibited no postictal state and was
immediately able to answer all questions regarding
orientation to person, place, time, etc. and was quite
coherent. Due to the dramatic nature of this event which
included the laceration to the gum, the patient was admitted
to the ICU for further observation. In the ICU, an EEG was
obtained. It was suggested to the patient that it would be
valuable for him to have a seizure while the EEG electrodes
were attached and the electroencephalogram was being
recorded. Several minutes later the patient started
exhibiting bilateral flailing movements of the lower

11

extremities which lasted several minutes.  There was no
evidence of epileptiform activity on the EEG during this
motor activity.  The patient was eventually discharged from
the hospital on the same dosage of Dilantin.  He continued
to present to the ER, often transported by his command
exhibiting motor activity consistent with nonepileptic
seizures.  It was subsequently recommended that he be given
a trial off of anticonvulsants.

In the middle of August 1995, he was admitted to the
Psychiatry Service.  (During this three to four month
period, the patient had approximately four psychiatric
inpatient hospitalizations.)  Shortly after admission to the
psychiatric ward, the patient gradually became stuporous
(unresponsive to verbal commands) and began exhibiting
intermittent motor activity every ten to twenty minutes
consisting of approximately one to two minutes of tonic
contraction of all extremities.  Patient was subsequently
transferred to the Intensive Care Unit where he remained
unresponsive and continued to have these brief periods of
intermittent tonic activity associated with gasping
respirations.  These gasping respirations lead to oxygen
desaturations as monitored by pulse oximetry (as low as the
mid 70s percentage of O2 saturation).  The patient was
treated for presumed status epilepticus with several doses
of Lorazepam and Diazepam and was reloaded with 1 gram of
Dilantin IV over a course of approximately 30 to 45 minutes.
These episodes gradually abated.  The patient was intubated
due to the gasping respirations with decreased oxygen
saturation.  Another lumbar puncture was performed to rule
out an infectious cause for the stuporous state.  This was
completely normal.  The patient was subsequently extubated
within a few hours, after which he exhibited no more
abnormal motor activity and two days later he was discharged
from the hospital.  The patient has subsequently been
readmitted to the Psychiatry Service at Naval Hospital, Camp
Lejeune, for ongoing pseudoseizures/conversion reaction.

(R. 839-41).

## 3.  **Letter from Physical Evaluation Board - 10/10/95**

By letter dated October 10, 1995, plaintiff was notified

that the Record Review Panel of the Physical Evaluation Board of

the Department of the Navy evaluated his case on October 2, 1995

12

and found that he was "unfit for duty" due to the following diagnoses: (1) conversion disorder, (2) conversion neurological symptoms, (3) pseudoseizures, (4) epilepsy and (5) status post episode of status epilepticus. The letter indicated that plaintiff's disability was assigned a 30% rating, and that plaintiff had been placed on the Temporary Disability Retired List. (R. 428-31).

### 4. VA Records - 2/9/96

On February 9, 1996, Karen Galin, Ph.D. performed a psychological assessment of plaintiff at the VA Medical Center in Pittsburgh based on a referral by the Neurology Department. Plaintiff informed Dr. Galin that his first seizure occurred in May 1995; that his last seizure occurred in September 1995; and that at the time the seizures developed, he was under stress from "having to do more work than others ... picking on me," and due to his staff sergeant "being on my back ... bothering me, calling me names." Plaintiff noted that he developed irritability, anger and aggressivity at about the same time. Following plaintiff's mental status examination, Dr. Galin described her diagnostic impression as conversion disorder and seizures versus pseudo-seizures. With respect to a treatment plan, Dr. Galin noted that plaintiff denied any distress and stated that he was not interested in any psychotherapy at that time. Plaintiff indicated that he had been told to get registered in the

13

Pittsburgh system "in case he should have problems in the
future."    (R. 211-13).

### 5.  **VA Records - 2/26/96**

On February 26, 2006, plaintiff underwent a compensation
examination by Thomas Eberle, Ph.D. in connection with his
pursuit of a determination that his conversion and seizure
disorders were service-connected, entitling him to disability
benefits from the VA.[17]  Plaintiff reported that his first
seizure occurred in May 1995, while he was driving a trash
vehicle on the beach in North Carolina, and that his last seizure
occurred in September 1995, when he began to choke on food and
lost consciousness in the mess hall.  Plaintiff denied
"psychiatric problems of any kind including depression, anxiety,
or other behavioral or emotional symptomatology."  Dr. Eberle
noted that none of plaintiff's medical records from his period of
military service were available for review at the time of this
examination.  (R. 210-11).

With respect to clinical observations, Dr. Eberle noted that
plaintiff was alert, oriented in all 3 spheres, in good contact
with reality and showed no signs or symptoms of psychosis.
Plaintiff spoke in normal tones, rhythm and rates (although he
seemed "a rather serious and somber person"), and he was polite

---

[17]Plaintiff applied for disability benefits from the VA on
January 3, 1996.  (R. 440).

14

and socially appropriate. Plaintiff's memory and intellect appeared to be intact, and there was no indication of concentration difficulties. Dr. Eberle noted that plaintiff "seemed rather indifferent to the nature of his seizure disorder and its possible effects or consequences and asked more specific questions about how a service connected disability would interact with vocational allotments from the government towards the end of attending school." Dr. Eberle described plaintiff's insight and judgment with respect to the nature of his conversion reactions as "minimal" at that time. (R. 209-10).

Based on the available medical records and his clinical examination of plaintiff, Dr. Eberle opined that plaintiff's possible diagnoses included conversion disorder, passive dependent personality disorder with passive aggressive features and seizure disorder, indicating that the "key to differential diagnosis" in plaintiff's case would be a "very thorough review of [plaintiff]'s prior psychiatric and neurological records," together with his current examination.[18]  (R. 208-09).

## 6.  VA Records - 6/11/96

On June 11, 1996, David J. Fink, M.D., Chief of Neurology at the VA Medical Center in Pittsburgh, issued a memorandum to the

---

[18]With respect to Dr. Eberle's clinical impression of "rule out conversion disorder," the doctor stated that he could not be more specific due to the unavailability of plaintiff's medical records from the service.  (R. 209).

15

Rating Board in connection with plaintiff's compensation examination. The memorandum stated: "I have reviewed the records of Robert Middleton. Based on these records, it is clear that this patient has pseudoseizures. There is no compelling evidence for seizures. No further neurologic evaluation is required at this time." (R. 441).

### 7. **VA Records - 7/17/96**

On July 17, 1996, the VA issued a Rating Decision in connection with plaintiff's January 3, 1996 claim for disability benefits from the VA. The issue was described as service connection for hemorrhoids and seizure/conversion disorder, and the decision was a denial. Specifically, the decision states: "Compensation is payable for a disease or injury which causes a disabling physical or mental limitation. The evidence regarding pseudoseizures and hemorrhoids fails to show a disability for which compensation may be established." (R. 438-40).

### 8. **VA Records - 3/11/97**

On March 11, 1997, plaintiff underwent an examination by William R. Bodner, M.D. at the VA Medical Center in Salisbury for compensation purposes.[19] In his report of the examination, Dr. Bodner described, in detail, plaintiff's "rather complicated"

---

[19]Plaintiff appealed the VA's July 17, 1996 denial of his claim for disability benefits, resulting in this examination of plaintiff, as well as a neuropsychological examination of plaintiff on March 19, 1997.

past medical history. With respect to plaintiff's mental status examination, Dr. Bodner noted, among other things, that plaintiff was alert, cooperative and volunteered information; that plaintiff exhibited no bizarre movements or tics; that plaintiff's mood was calm and his affect was appropriate; that plaintiff demonstrated no delusions, hallucinations, ideas of reference or suspiciousness; that plaintiff was oriented in all 3 spheres; that plaintiff's memory, both recent and remote, was good; and that plaintiff's insight, judgment and intellectual capacity appeared to be adequate. Dr. Bodner's diagnosis was cognitive disorder, not otherwise specified, and he recommended that plaintiff receive a complete neurological workup to ascertain the true nature and extent of his symptoms. (R. 424-27).

## 9.  VA Records - 3/19/97

On March 19, 1997, an evaluation of plaintiff was performed by Thomas J. Harbin, Ph.D., a neuropsychologist, in connection with plaintiff's claim for disability compensation from the VA.[20] (R. 416-21). With respect to clinical observations, Dr. Harbin stated in his report: "The overall impression that [plaintiff] gave was of an intense, African-American male of average

---

[20]With regard to his evaluation of plaintiff, Dr. Harbin noted that medical records and military information were not available for his review. (R. 416).

17

intelligence.  His history was presented in a mildly dramatic
fashion.  There was no evidence of symptom feigning or
exaggeration and this evaluation is most likely a valid estimate
of the patient's current psychological and behavioral
functioning."   (R. 418).

     Dr. Harbin administered several tests to plaintiff.
Regarding the Minnesota Multiphasic Personality Inventory - 2
(MMPI-2), Dr. Harbin reported that the results were valid and
suggested plaintiff was experiencing "a great deal of turmoil,"
and that plaintiff's psychological distress may "result in
physical symptoms for which no organic pathology is obvious."
Turning to the Wechsler Adult Intelligence Scale - Revised (WAIS-
R), plaintiff's scores placed him on the border between average
and below-average intellectual functioning.  As to the other
tests administered by Dr. Harbin, plaintiff's performance on
tests of memory was inconsistent, his performance on measures of
attention was within normal limits with few deficiencies noted,
his performance on language tests was within normal limits with
few deficiencies noted, and his visual perception and
reconstruction were severely impaired.   (R. 418-20).

     In his summary, conclusions and recommendations, Dr. Harbin
indicated, among other things, that there was evidence of
cognitive impairment in plaintiff's performance; that plaintiff's
personality evaluation was consistent with brain damage, noting

18

that plaintiff "is likely to be anxious, tense, restless, extroverted, and aggressive;" that any elevation in plaintiff's "perceived stress level will result in the development of physical symptoms for which there may be no obvious organic basis;" and that his diagnostic impression was cognitive disorder, not otherwise specified. (R. 420-21).

### 10. VA Records - 6/2/97 to 6/16/97

A Rating Decision was issued on June 2, 1997 in connection with plaintiff's claim for disability benefits from the VA. The issue was described as "Service connection for cognitive disorder, not otherwise specified (claimed as seizure/pseudo-seizure disorder)," and the finding was favorable to the extent that plaintiff's condition was determined to be 10% disabling effective January 1, 1996.[21]  (R. 412-14).

In the statement of reasons for the decision, the examiner noted, among other things, that there was "no evidence of symptom feigning or exaggeration;" that plaintiff's psychological assessment was "felt to be valid;" that there was evidence of cognitive impairment in performance; and that plaintiff's

---

[21]The Rating Decision noted that an evaluation of 10% disabling "is granted whenever there is occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress; or symptoms controlled by continuous medication." (R. 412).

19

personality evaluation was consistent with brain damage.  (R. 413).

Plaintiff was notified of the VA's Rating Decision on June 3, 1997 (R. 409-10), and, on June 16, 1997, plaintiff registered his disagreement with the decision, arguing that (1) due to his inability to handle stress, he continually had to take breaks at work, and (2) he was discharged from the United States Marine Corps with a 30% disability rating.  (R. 404).

## 11.  VA Records - 8/9/97

On August 9, 1997, the VA issued a further Rating Decision with respect to the evaluation of plaintiff's cognitive disorder, NOS as 10% disabling.  Based on evidence submitted by plaintiff, his employer and the Naval Hospital at Camp Lejuene, North Carolina, plaintiff's cognitive disorder, NOS was increased to 30% disabling effective January 1, 1996.[22]  (R. 392).

---

[22]The Rating Decision noted that an evaluation of 30% disabling "is granted whenever there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events)."  The Rating Decision also noted that a statement from plaintiff's employer indicated that plaintiff "is given a break of at least 15 minutes every 2 hours to avoid headaches and fatigue."  (R. 392).

20

**12. Report of Periodic Physical Examination - 9/22/97**

On September 22, 1997, plaintiff underwent his periodic physical examination at the Naval Hospital at Camp Lejeune, North Carolina. The report of the examination indicates that plaintiff had been placed on the Temporary Disability Retired List for the following diagnoses: conversion disorder, pseudoseizures, epilepsy and status post status epilepticus. The report further indicates that since his placement on the Temporary Disability Retired List, plaintiff had been employed intermittently and was currently employed as a telephone operator, and that plaintiff had lost time from work "due to fears, miss-trustfulness (sic), suspiciousness and feelings of being persecuted." (R. 388).

At the time of the examination, plaintiff continued to complain of difficulty maintaining his job, nervousness, trembling, shaking, fears and spasms, and, during the examination, plaintiff was described as "quite suspicious, mistrusting and misinterpreted perceptions." (R. 388). The examiner recommended that plaintiff continue regular supportive psychotherapy on an outpatient basis, and that he follow-up with the Neurology Department for seizures. The examiner stated that no medications were indicated at that time, and it was his opinion that plaintiff remained unfit for military service and should be placed on "permanently retired with a medical disability." Plaintiff's final diagnoses were (1) conversion

21

disorder, (2) common migraine headaches, (3) pseudoseizures, (4) history of seizure disorder, and (5) paranoid personality disorder. (R. 389).

## 13. VA Records - 5/5/00

On May 5, 2000, plaintiff presented to the Emergency Room of the VA Medical Center in Fayetteville, North Carolina requesting to "see mental health today," because he had been depressed, nervous and suffering from insomnia since 1996 but had never been treated with medication for any of these problems. Plaintiff was referred for a mental health evaluation during which he reported suffering from severe headaches for a long time, as well as an inability to sleep well. Plaintiff also reported that he was depressed, irritable and had begun to isolate himself. Plaintiff was described as alert, oriented to time, place and person, and cooperative with an irritable, dysphoric mood. Paxil, Ambien and Hydroxyzine were prescribed for plaintiff. (R. 380).

## 14. VA Records - 4/5/01

On April 5, 2001, plaintiff underwent an examination by R. Lees, Ph.D. for VA compensation purposes. Dr. Lees noted that plaintiff's last compensation examination had been performed on February 2, 1996 and resulted in a service-connected disability rating of 30% based on an "unspecified cognitive deficit (conversion disorder/pseudo-seizures)." With respect to plaintiff's mental status examination, Dr. Lees noted that

22

plaintiff was casually dressed, well groomed and cooperative during the interview; that plaintiff appeared tense, depressed and anxious; that plaintiff's score on the Beck Depression Inventory was 34, placing him in the range of severe depression;[23] that plaintiff's score on the Beck Anxiety Index was 33, which also is in the severe range; that plaintiff reported symptoms of "feeling shaky, hands trembling, numbness or tingling, feeling hot, dizzy or light-headed, heart pounding or racing, indigestion or discomfort in the abdomen;" that plaintiff denied psychotic symptoms and none were manifested during the examination; that plaintiff's attention and concentration were variable; and that plaintiff's insight and judgment were limited.

Dr. Lees' diagnoses included (a) cognitive deficit, NOS (conversion disorder/pseudoseizures), chronic; (b) history of seizures; and (c) severe psychosocial stressors, and he rated plaintiff's score on the Global Assessment of Functioning ("GAF")

---

[23] In this regard, Dr. Lees noted that plaintiff reported loss of interest in other people, feeling too tired to do anything, dissatisfaction or boredom with everything, feeling guilty a good part of the time, no appetite at all and less interest in sex. (R. 345).

23

scale as a 48.[24]  Dr. Lees summarized his examination of

plaintiff as follows:

> SUMMARY: This complicated individual continues to
> demonstrate the interconnected sensory, motor and
> psychological symptoms consistent with previous findings.
> It does appear that his combined symptoms underlying his
> unspecified cognitive deficit have increased in intensity.
> He has not been able to maintain employment.  He is showing
> severe symptoms of both depression and anxiety along with
> the conversion symptoms of numbing and prickly sensations
> coming under any kind of stress.  He does not appear to be
> able to maintain employment.  He was recommended to obtain
> treatment at this facility.  He expressed interest in this.
> He will be referred to Omega Team.

(R. 342-46).

### 15.  VA Records - 7/6/01

Plaintiff presented to the VA Medical Center in Pittsburgh

for a follow-up visit in connection with his history of seizures

and conversion disorder.  Plaintiff reported that he had been

free of "conversion reactions" since 1995, and that his problems

since that time have been psychological.  A current screening for

---

[24]The GAF scale considers psychological, social and
occupational functioning on a hypothetical continuum of mental
health - illness and is used by clinicians to report an
individual's overall level of functioning.  The highest possible
score is 100 and the lowest is 1.  GAF scores between 41 and 50
denote the following: "**Serious symptoms** (e.g., suicidal ideation,
severe obsessional rituals, frequent shoplifting) **OR any serious
impairment in social, occupational, or school functioning** (e.g.,
no friends, unable to keep a job)." (Emphasis in original).
American Psychiatric Association, Diagnostic and Statistical
Manual of Mental Disorders, Fourth Edition ("DSM-IV"), pp. 32-34.

24

mental disorders was discussed and plaintiff agreed with this
plan.   (R. 207-08).

## 16.   Report of Leon Kalson, Ph.D. - 8/14/01

On August 14, 2001, plaintiff underwent a consultative
psychological evaluation by Leon Kalson, Ph.D. at the request of
the Pennsylvania Bureau of Disability Determination in connection
with his application for DIB.   (R. 113-17).   With respect to
plaintiff's mental status examination, Dr. Kalson noted that
plaintiff "registered constricted affect with appropriate eye
contact," and that he was "articulate and matter of fact."[25]   Dr.
Kalson diagnosed plaintiff as suffering from conversion disorder
(300.11) and seizure disorder, and he indicated that plaintiff's
prognosis was "Chronic."   Dr. Kalson described his summary and
conclusion as follows:

> Present evaluation reveals that Robert Middleton's
> occupational function is severely limited by conversion
> symptoms, depression, and affective instability.   He is
> treated by the VA and has been granted a 70% disability
> rating.   He is presently unable to cope with the stresses

---

[25]Dr. Kalson also noted that plaintiff explained his
situation as follows: "I'm not looking to sit on my ass.   I'm
going to Pittsburgh Beauty Academy through OVR where I'm making
A's and B's.   I'm easily stressed.   I get shaky with chronic
headaches; they tried antidepressants.   I feel I'll be able to
cope better if I can work on a part-time basis.   I stay to myself
because I get pissed off easily and want to avoid confrontations
which I can't handle."   (R. 114).

25

and demands of sustained gainful employment and has begun
cosmetology training under OVR sponsorship."[26]

(R. 113-17).

### 17. Psychiatric Review Technique Form - 9/25/01

On September 25, 2001, a Psychiatric Review Technique form
was completed by Douglas Schiller, Ph.D, a non-examining State
agency physician, in connection with plaintiff's application for
DIB.  Dr. Schiller indicated that plaintiff suffers from
conversion disorder, which (a) mildly limits his activities of
daily living; (b) moderately limits his social functioning and
ability to maintain concentration, persistence and pace; and (c)
has not resulted in any episodes of decompensation of extended
duration.  (R. 119-32).

### 18. Mental Residual Functional Capacity Assessment - 9/25/01

Dr. Schiller also completed a Mental Residual Functional
Capacity Assessment for plaintiff on September 25, 2001.  With
respect to sustained concentration and persistence, Dr. Schiller
indicated that plaintiff's ability to work in coordination with
or proximity to others without being distracted by them *and* his
ability to complete a normal workday and workweek without
interruptions from psychologically based symptoms and to perform

---

[26]Plaintiff's disability rating for his cognitive disorder
had been increased from 30% to 70% by a VA Rating Decision dated
May 25, 2001.  (R. 164).

26

at a consistent pace without an unreasonable number and length of
rest periods were moderately limited. As to social interaction,
Dr. Schiller indicated that plaintiff's ability to accept
instructions and respond appropriately to criticism from
supervisors was moderately limited. Finally, regarding
adaptation, Dr. Schiller indicated that plaintiff's ability to
respond appropriately to changes in the work setting was
moderately limited. In elaborating on his conclusions, Dr.
Schiller stated, among other things, that, while plaintiff's
allegations are partly credible, he appeared capable of routine
substantial gainful activity in a stable setting. (R. 133-35).

**19. Records of Onslow Memorial Hospital - 10/24/01**

On October 24, 2001, plaintiff presented to the Emergency
Room of Onslow Memorial Hospital in Jacksonville, North Carolina
with the following complaint: "felt body moving, body tingling."
Plaintiff was diagnosed with anxiety and nicotine withdrawal, and
he was given Valium. (R. 137-40).

**20. Records from Jacksonville Family Medical Center -
11/16/01**

Plaintiff presented to the Jacksonville Family Medical
Center in Jacksonville, North Carolina on November 16, 2001 to
"establish care," and he was evaluated by Dr. Ricky Thomas.
Plaintiff reported that his past medical history included
epilepsy and conversion disorder. Plaintiff also reported that

27

he suffered from insomnia and frequent headaches which cause
photophobia and dizziness. With respect to the review of
plaintiff's systems, Dr. Thomas noted, among other things, that
plaintiff denied fatigue, depression, anxiety, memory loss,
mental disturbance, suicidal ideation, hallucinations and
paranoia. However, plaintiff reported that he has GERD. As to
plaintiff's physical examination, Dr. Thomas described plaintiff,
generally, as "well nourished, well hydrated, no acute distress."
Finally, regarding plaintiff's mental status examination, Dr.
Thomas indicated that plaintiff's judgment was intact, he was
oriented to time, place and person, his memory was intact for
recent and remote events and he did not appear depressed, anxious
or agitated.  (R. 142-43).

**21. Report of Final Periodic Physical Examination -
11/28/01**

On November 28, 2001, plaintiff underwent a "final periodic
physical examination" at the Naval Hospital at Camp Lejeune,
North Carolina.  (R. 165-66).  The report of the examination
indicates that plaintiff had been placed on the Temporary
Disability Retired List on January 1, 1996 with the diagnoses of
conversion disorder and conversion neurologic symptoms. During
the examination, plaintiff complained of continual stress,
frequent headaches, fatigue and stomach pain from GERD, and
plaintiff reported that he had remained seizure and pseudoseizure

28

free since his discharge from the military.  Plaintiff also reported that he found himself "needing to be by himself;" that he has a short temper and does not trust people; and that he was seeking mental health care to deal with stress.  (R. 166).

The examining physician described plaintiff's mental status examination as follows:

> Mental status examination at the time of evaluation revealed a well developed, well nourished African/American male who appeared his stated age and who was in no acute distress.  He maintained good eye contact.  Speech was of normal rate, rhythm and volume and was without pressure. Mood was euthymic with a full mood congruent affect. Thought processes were logical, linear, and goal directed. Thought content was notable for themes of distrust of others but there was no frank delusions or hallucinations. Cognition was intact.  Insight was fair.  Judgment was intact.  He denied suicidal or homicidal ideations.

(R. 166).

The examining physician's diagnoses included conversion disorder, resolved, undifferentiated somatoform disorder, anxiety disorder, NOS and personality disorder, NOS, and he rendered the opinion that plaintiff remained unfit for military service and should be medically discharged from the military or permanently retired on disability.  (R. 166).

## 22.  VA Records - 12/18/01

A Rating Decision was issued by the VA on December 18, 2001 with respect to plaintiff's entitlement to individual unemployability and eligibility for Dependents' Educational Assistance under Chapter 35 of the United States Code.  The

29

decision granted individual unemployability to plaintiff "because the claimant is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities," and denied plaintiff's eligibility for Dependents' Educational Assistance based on his failure to show that he had a total service-connected disability which was permanent in nature. (R. 164).

**23.  Findings of the Physical Evaluation Board Proceedings - 2/6/02**

On February 6, 2002, findings were issued in connection with plaintiff's Physical Evaluation Board Proceedings which originated at Camp Lejeune in North Carolina. Specifically, it was determined that plaintiff was "unfit" for military service, and it was recommended that plaintiff be separated from the Temporary Disability Retired List with severance pay. The "unfitting condition" was listed as anxiety disorder, NOS, and the conditions which contributed to the unfitting condition included conversion disorder, epilepsy, status post episode of status epilepticus, undifferentiated somatoform disorder, pseudoseizures and conversion neurological symptoms. (R. 162-63).

**24.  VA Records - 9/20/02**

On September 20, 2002, plaintiff underwent a psychiatric evaluation at the VA Medical Center in Pittsburgh by Dr. Nasim

Shajihan.  Plaintiff described his chief complaint at that time
as follows: "I feel like I am a walking time bomb."  Plaintiff
indicated that he had been "100% unemployable since January,"
reporting that he had been on 70% disability since the previous
June.  Plaintiff also reported that his stress level had
increased because the VA "might reduce his unemployability"
rating.[27]  Dr. Shajihan's diagnoses included (1) major
depression, single episode, (2) generalized anxiety disorder and
(3) schizoid personality traits, and he rated plaintiff's GAF
score as a 45.[28]  Medications were discussed, and plaintiff was
to make a decision with respect to medications by his next
appointment which was scheduled for the following week.  (R. 203-
05).

### 25.  VA Records - 10/4/02

Plaintiff returned to the VA Medical Center in Pittsburgh
for a follow-up visit with Dr. Shajihan on October 4, 2002.
Plaintiff reported that he "[c]ontinues to be very depressed and

---

[27]Other stressors reported by plaintiff at that time included
the pregnancy of his girlfriend of two months and the illness of
his parents.  With respect to his mental state, plaintiff
reported feeling depressed and anxious all the time, worrying
excessively about what is going to happen, difficulty
concentrating, an inability to enjoy anything, being very
withdrawn, an inability to sleep, frequent headaches,
irritability and muscle tension.  (R. 204).

[28]As noted in footnote 24, a GAF score between 41 and 50
denotes serious symptoms or any serious impairments in social,
occupational or school functioning.

31

anxious, feels some tension in his abdomen, has difficulty
sleeping at night, is up most of the night, is very irritable,
says he is not actively suicidal or homicidal, but is unable to
function and cannot work at this time." During the visit,
plaintiff stressed his inability to work and the increase in his
stress level due to notice from the VA that his disability
benefits might be reduced. Dr. Shajihan rated plaintiff's GAF
score as a 50. Effexor was prescribed for plaintiff, and he was
instructed to return in 2 weeks for a follow-up visit. (R. 202-
03).

## 26. VA Records - 11/8/02

Plaintiff returned to the VA Medical Center in Pittsburgh
for a follow-up visit with Dr. Shajihan on November 8, 2002.
Plaintiff reported being stressed out by the ongoing VA
proceedings regarding his disability status. Plaintiff stated
that he was very depressed and anxious, unable to focus on
anything, afraid that people do not understand him, and worried
that he might deteriorate if forced to go back to work. Dr.
Shajihan rated plaintiff's GAF score as a 50, and he increased
the dosage of Effexor to be taken by plaintiff. (R. 199-200).

## III. Legal Analysis

### A. Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C.
§ 405(g), which provides that an individual may obtain judicial

review of any final decision of the Commissioner by bringing a
civil action in the district court of the United States for the
judicial district in which the individual resides.

The Court's review of the Commissioner's decision is limited
to determining whether the decision is supported by substantial
evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but
something less than a preponderance. Dobrowolsky v. Califano,
606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence. Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir.1986).

## B. The 5-Step Sequential Evaluation Process

In Burnett v. Commissioner of Social Security Admin., 220
F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure
an ALJ must follow in evaluating a claim for Social Security
disability benefits, stating in relevant part:

                    *    *    *

In Plummer, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

33

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity.  20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287,
2290-91, 96 L.Ed.2d 119 (1987).  In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment.  20 C.F.R.
§ 404.1520(c).  If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work.  20 C.F.R. § 404.1520(d).  If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five.  Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work.  20 C.F.R.
§ 404.1520(d).  The claimant bears the burden of
demonstrating an inability to return to her past
relevant work.  Adorno v. Shalala, 40 F.3d 43, 46 (3d
Cir.1994).

If the claimant is unable to resume her former
occupation, the evaluation moves to the final step.  At
this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability.  20 C.F.R. § 404.1520(f).
The ALJ must show there are other jobs existing in
significant numbers in the national economy which the
claimant can perform, consistent with her medical
impairments, age, education, past work experience, and
residual functional capacity.  The ALJ must analyze the
cumulative effects of all the claimant's impairments in
determining whether she is capable of performing work
and is not disabled.

Plummer, 186 F.3d at 428.

\*    \*    \*

220 F.3d at 118-19.

34

.        .

        With respect to the ALJ's application of the five-step
sequential evaluation process in the present case, steps one and
two were resolved in plaintiff's favor: that is, based on the
record, the ALJ found that (a) plaintiff had not engaged in
substantial gainful activity since his alleged onset date of
disability, and (b) plaintiff suffers from severe impairments,
including a personality disorder, major depression and an anxiety
disorder.  (R. 20, 25).  Turning to step three, the ALJ found
that plaintiff's impairments did not meet or medically equal,
either singly or in combination, any of the listed impairments in
Section 12.00 of Appendix 1 to Subpart P of Part 404 of the
Social Security Regulations, relating to Mental Disorders.  (R.
25).  With regard to step four, the ALJ found that plaintiff can
no longer perform his past relevant work because the jobs
required frequent interaction with either co-workers or members
of the public which is precluded by plaintiff's RFC.  (R. 29).
Finally, at step five, based on the testimony of the VE, the ALJ
found that plaintiff was capable of making a successful
adjustment to work existing in significant numbers in the
national economy.  Thus, plaintiff was not disabled.  (R. 30).

**C. Plaintiff's Arguments in Support of Summary Judgment**

        Plaintiff raises several arguments in support of his motion
for summary judgment which the Court will address seriatim.

35

i

First, plaintiff asserts that the ALJ erred by rejecting his

diagnoses of conversion disorder and cognitive disorder in light

of the record in this case.   Plaintiff maintains that the ALJ

improperly substituted his lay opinion for the opinions of

numerous medical experts regarding these diagnoses, requiring the

remand of this matter for further proceedings.   See Morales v.

Apfel, 225 F.3d 310 (3d Cir.2000)(In considering claim for

disability benefits, ALJ may not make speculative inferences from

medical reports and may reject a treating or examining

physician's opinion outright only on the basis of contradictory

medical evidence and not due to his or her own credibility

judgments, speculation or lay opinion).[29]   After consideration,

the Court agrees.

With respect to the diagnosis of conversion disorder, as

noted by plaintiff, the record is replete with this diagnosis

beginning in June, 1995 while plaintiff was in the military,[30]

and continuing throughout plaintiff's pursuit of disability

compensation from the VA,[31] as well as his pursuit of DIB from

---

[29]In Morales, the Third Circuit also noted "[t]he principle
that an ALJ should not substitute his lay opinion for the medical
opinion of experts is especially profound in a case involving a
mental disability."   225 F.3d at 319.

[30]R. 162, 166, 389, 428, 755.

[31]R. 211.

36

the Social Security Administration.[32]  Despite the abundance of
medical evidence supporting plaintiff's diagnosis of conversion
disorder and no medical evidence contradicting the diagnosis, the
ALJ found that "the record when viewed in its entirety fails to
support the diagnosis of conversion disorder but rather supports
the conclusion that the claimant was malingering."  (R. 28).  The
Court agrees with plaintiff that there simply is no basis in the
record for the ALJ's finding in this regard, and, as noted in
footnote 11, by definition, the diagnosis of conversion disorder
excludes malingering.

    Similarly, a review of the record shows that plaintiff's
diagnosis of cognitive disorder is well supported by the medical
evidence.[33]  In rejecting this diagnosis, the ALJ relied, in
large part, on the fact that Thomas Harbin, Ph.D., a
neuropsychologist who evaluated plaintiff in connection with his
claim for disability compensation from the VA and opined that
plaintiff suffers from cognitive disorder, NOS, did not have
plaintiff's medical records from his military service which
allegedly are replete with evidence of symptom feigning.  First,
the Court notes that a review of Dr. Harbin's report shows that
plaintiff, in fact, informed Dr. Harbin that, despite the
seizure-like symptoms he experienced during his military service,

_____

[32]R. 115, 125.

[33]R. 345, 421, 427.

37

all neurological examinations and tests had been negative, and, with respect to the alleged evidence of symptom feigning in the medical records from plaintiff's military service, plaintiff informed Dr. Harbin that he had been treated for conversion disorder which, as noted previously, negates a finding that the individual is malingering. Therefore, the significance the ALJ placed on the unavailability of plaintiff's medical records from his military service for review by Dr. Harbin was erroneous. Second, in rejecting Dr. Harbin's diagnosis of cognitive disorder, the ALJ ignored the fact that several other examining physicians diagnosed plaintiff with the same disorder. Specifically, on March 11, 1997, Dr. Bodnar, who examined plaintiff for purposes of his entitlement to disability compensation from the VA, diagnosed plaintiff with cognitive disorder, NOS, and, on April 5, 2001, R. Lees, Ph.D., who also examined plaintiff for VA disability compensation purposes, opined that plaintiff suffered from cognitive deficit, NOS. (R. 342-46, 424-27). Finally, the Court notes the absence of contrary medical evidence to support the ALJ's rejection of the diagnosis of cognitive disorder.

In sum, in light of the absence of medical evidence to contradict the diagnoses of conversion disorder and cognitive disorder in this case, it is clear that the ALJ impermissibly substituted his lay opinion for the opinions of medical experts

38

.        »

who treated or examined plaintiff.   Under the circumstances, the
Court agrees with plaintiff that a remand is necessary for the
ALJ to evaluate the functional limitations resulting from these
impairments on plaintiff's ability to engage in substantial
gainful activity.

ii

Next, plaintiff asserts that the ALJ erred by failing to
"mention, let alone discuss," the consultative examination report
of Leon Kalson, Ph.D., requiring remand.   Again, the Court
agrees.

In Burnett v. Commissioner of Social Security Admin., 220
F.3d 112 (3d Cir.2000), a Social Security disability claimant
with knee and back pain sought judicial review of the
Commissioner's denial of her claim.   The district court affirmed
the denial, and the claimant appealed.   The Third Circuit vacated
the Commissioner's decision and remanded the case for further
proceedings based on, among other things, the ALJ's failure to
mention or refute some of the contradictory, objective medical
evidence before him in making his RFC determination.   In this
regard, the Third Circuit stated:

*    *    *

...   Burnett contends the ALJ's decision is not supported by
substantial evidence because: (i) the ALJ failed to consider
all of the evidence before him;...

39

.        *

        The ALJ did err by reason of his failure to consider and
explain his reasons for discounting all of the pertinent
evidence before him in making his residual functional
capacity determination.  In making a residual functional
capacity determination, the ALJ must consider all evidence
before him.   See Plummer, 186 F.3d at 429; Doak v. Heckler,
790 F.2d 26, 29 (3d Cir.1986).  Although the ALJ may weigh
the credibility of the evidence, he must give some
indication of the evidence which he rejects and his
reason(s) for discounting such evidence.   See Plummer, 186
F.3d at 429; Cotter, 642 F.2d at 705.  "In the absence of
such an indication, the reviewing court cannot tell if
significant probative evidence was not credited or simply
ignored."  Cotter, 642 F.2d at 705.

                    *    *    *

220 F.3d at 121.

        As noted by plaintiff, contrary to this well-established

principle of Social Security law, the ALJ failed to discuss in

his decision the report of Dr. Kalson, who conducted a

consultative psychological evaluation of plaintiff at the request

of the Pennsylvania Bureau of Disability Determination on August

14, 2001 in connection with his claim for DIB.  Significantly,

Dr. Kalson opined that plaintiff was "severely limited by

conversion symptoms, depression and affective instability," and

that plaintiff was "unable to cope with the stresses and demands

of substantial gainful employment."  (R. 114).

        Similarly, the Court notes that the ALJ failed to discuss in

his decision the report of R. Lees, Ph.D., who examined plaintiff

for VA disability compensation purposes on April 5, 2001.  In the

report prepared following his examination of plaintiff, Dr. Lees

                            40

noted that plaintiff's scores on the Beck Depression Inventory and the Beck Anxiety Index showed that plaintiff was severely depressed and anxious; that plaintiff's diagnoses included cognitive deficit, NOS and severe psychosocial stressors; that plaintiff's score on the GAF scale was 48, indicating serious symptoms or serious impairment in social and occupational functioning; and that it did not appear as if plaintiff was capable of maintaining employment. (R. 342-46).

Under the circumstances, on remand, the ALJ is directed to address the reports of both Dr. Kalson and Dr. Lees.

iii

Next, plaintiff asserts that the ALJ erred by failing to discuss the significance of the VA's determination that plaintiff is totally disabled from employment based on his mental impairments. Again, the Court agrees.

Despite the fact that the VA's disability determination is not binding on the Commissioner, it is nonetheless relevant and should have been addressed by the ALJ. See Kane v. Heckler, 776 F.2d 1130 (3d Cir.1985)(Determination by another government agency that claimant is disabled is entitled to substantial weight before Secretary of Health and Human Services); Fowler v. Califano, 596 F.2d 600 (3d Cir.1979)(Although findings by other agencies are not binding in Social Security disability benefits case, they are entitled to weight and must be considered).

41

.          ▪

Accordingly, on remand, the ALJ is directed to address the

significance of the VA's conclusion that plaintiff's mental

impairments render him totally disabled from employment.

iv

Finally, plaintiff asserts that in light of the above-

referenced errors by the ALJ, the hypothetical question posed by

the ALJ to the vocational expert did not accurately portray his

impairments.  Therefore, the vocational expert's response to the

hypothetical question does not constitute substantial evidence

supporting the ALJ's decision denying plaintiff's claim for DIB.

Again, the Court agrees.

In Burns v. Barnhart, 312 F.3d 113 (3d Cir.2002), a claimant

sought judicial review of a decision of the Commissioner denying

his application for supplemental security income under the Social

Security Act.  The district court granted summary judgment for

the Commissioner, and the claimant appealed.  The Third Circuit

affirmed in part, reversed in part, and remanded with

instructions.  With respect to the claimant's contention that the

vocational expert's testimony did not provide substantial

evidence supporting the adverse decision because the ALJ's

questioning of the vocational expert was deficient, the Third

Circuit stated in pertinent part:

*     *     *

42

Burns argues that this hypothetical question did not take into account his deficiency in intellectual functioning as disclosed in Dr. Laviolette's report.  Quite clearly, the ALJ did not pose any questions to the vocational expert based on Dr. Laviolette's report - the report did not exist at the time of the hearing.  Nevertheless, the Commissioner contends that the ALJ's use of the factor of "simple repetitive one, two-step tasks" was sufficiently descriptive to encompass the post-hearing findings of Dr. Laviolette.  Our case law, however, directs that greater specificity is required.

Discussing hypothetical questions posed to vocational experts, we have said that "[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments."  Podedworny, 745 F.2d at 218.  A hypothetical question posed to a vocational expert "must reflect *all* of a claimant's impairments."  Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir.1987)(emphasis added).  Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence.  Podedworny, 745 F.2d at 218 (citing Wallace v. Secretary of Health & Human Servs., 722 F.2d 1150, 1155 (3d Cir.1983).

Here, the ALJ's hypothetical did not refer to any of the type of limitations later outlined in Dr. Laviolette's report.  Instead, it merely referred to "simple repetitive one, two-step tasks."  This phrase, however, does not specifically convey Burns' intellectual limitations referenced in Dr. Laviolette's report.  Rather, it could refer to a host of physical and mental limitations, such as a person's mechanical or small motor skills, his lack of initiative or creativity, or a fear of, or unwillingness to take on, unfamiliar tasks.  While the phrase could encompass a lack of intelligence, it does not necessarily incorporate all of the borderline aspects of Burns' intellectual functioning or the other deficiencies identified in Dr. Laviolette's report.  For example, it certainly does not incorporate Dr. Laviolette's finding that Burns is borderline in the areas of reliability, common sense, ability to function independently, and judgment, or that he

43

manifests flightiness, disassociation, oppositional
tendencies, and difficulties in comprehension.  As a result,
the hypothetical did not include all of the limitations
suffered by Burns, thus making it deficient.

                          *    *    *

312 F.3d at 122-23.

    In light of the ALJ's rejection of plaintiff's diagnoses of

conversion disorder and cognitive disorder, the Court concludes

that the ALJ's hypothetical question to the vocational expert was

deficient because it did not portray adequately all of the

limitations resulting from plaintiff's mental impairments which

are supported by the medical evidence.  For example, the

hypothetical question did not include the significant limitations

set forth in Dr. Kalson's report, presumably because Dr. Kalson

diagnosed plaintiff with conversion disorder which the ALJ

rejected.[34]  Under the circumstances, on remand, the ALJ is

directed to obtain additional vocational expert testimony to

remedy the deficiencies in his hypothetical question to the

vocational expert at the first hearing.

_____

    [34]Specifically, Dr. Kalson, the examiner to whom plaintiff
was referred for a consultative psychological evaluation by the
Pennsylvania Bureau of Disability Determination, rendered the
opinion that plaintiff was significantly limited in the following
work-related areas: (1) ability to relate to co-workers; (2)
ability to deal with the public; (3) ability to interact with
supervisors; (4) ability to deal with work stresses; (5) ability
to concentrate; (6) ability to behave in an emotionally stable
manner; (7) ability to relate predictably in social situations;
and (8) ability to demonstrate reliability.  (R. 116-17).

                            44

## IV.   Conclusion

In summary, on remand, the ALJ is directed to (1) evaluate the functional limitations resulting from plaintiff's conversion disorder and cognitive disorder; (2) address the reports of Leon Kalson, Ph.D. and R. Lees, Ph.D., which support plaintiff's claim for DIB; (3) discuss the significance of the VA's determination that plaintiff is totally disabled from employment as a result of his mental impairments; and (4) obtain additional vocational expert testimony concerning plaintiff's ability to engage in substantial gainful activity in light of all of the functional limitations resulting from his mental impairments.

William L. Standish
United States District Judge

Date: April 25, 2007

45